## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| ELIU TOSSAS-CASTRO, ESTEBAN TOSSAS-CASTRO AND NORMAN COLON-CORDOVA,<br><br>Plaintiffs<br><br><br>v.<br><br><br>MIGUEL A. MERCED-TORRES, YAIDY CRUZ-COTTO, THE LEGAL CONJUGAL PARTNERSHIP COMPOSED BY THEM AND MM TECHNOLOGY WIRELESS GROUP, CORP., A/K/A MMTWG, CORP.,<br><br>Defendants | CIVIL NO. 14-1419<br><br>RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT; ARTICLES 1802 AND 1077 OF THE PR CIVIL CODE<br><br><br>PLAINTIFFS DEMAND TRIAL BY JURY |

### COMPLAINT

**TO THE HONORABLE COURT:**

   **COME NOW** the Plaintiffs, and through the undersigned attorneys, very respectfully aver and pray as follows:

1

Case 3:14-cv-01419-GAG-SCC   Document 1   Filed 05/21/14   Page 2 of 21

**COMPLAINT**

2

Eliu Tossas-Castro, et al. v. Miguel A. Merced-Torres, et al.

## I.   INTRODUCTION

1.   This is a civil action brought pursuant to the Racketeer Influenced and Corrupt Organizations Act(Hereinafter "RICO"), 18 U.S.C. § 1962(c) and Articles 1802, 1044 and 1077 of the Puerto Rico Civil Code.

## II.   JURISDICTION & VENUE

2.   The jurisdiction of this Honorable Court is hereby invoked under 28 U.S.C. § 1331 and § 1343(3), since the action arises under the laws of the United States. Supplemental Jurisdiction is also invoked under 28 U.S.C. § 1367. The state claims are related to the federal claims in this action, since they form part of the same case or controversy under Article III of the United States Constitution as provided by 28 U.S.C. § 1367(a). Venue lies on this district pursuant to 28 U.S.C.A. § 1391(a)(2) because the instant claims arose in the district of Puerto Rico.

## III. THE PARTIES

3.   Plaintiff Eliu Tossas-Castro(Hereinafter "Mr. Eliu Tossas") is a resident of the Commonwealth of Puerto Rico and one of the victims of the Defendants' fraudulent and illegal acts.

4.   Plaintiff Esteban Tossas-Castro(Hereinafter "Mr. Esteban Tossas") is a resident of the Commonwealth of Puerto Rico and

Case 3:14-cv-01419-GAG-SCC   Document 1   Filed 05/21/14   Page 3 of 21

COMPLAINT                                                                      3
Eliu Tossas-Castro, et al. v. Miguel A. Merced-Torres, et al.

one of the victims of the Defendants' fraudulent and illegal acts.

5.   Plaintiff Norman Colón-Cordova (Hereinafter "Mr. Colon-Cordova") is a resident of the Commonwealth of Puerto Rico and one of the victims of the Defendants' fraudulent and illegal acts.

6.   Defendant Miguel A. Merced-Torres (Hereinafter "Mr. Merced-Torres") is a resident of the Commonwealth of Puerto Rico who is the president, the sole owner of MM Technology Wireless Group, Corp. and the mastermind behind the Defendants' illegal and fraudulent acts.

7.   Defendant Yaidy Cruz-Cotto is the wife of co-defendant Miguel A. Merced-Torres and is a resident of the Commonwealth of Puerto Rico.

8.   Defendant MM Technology Wireless Group, Corp.(a/k/a MMTWG, Corp.) is a for profit corporation incorporated by Miguel A. Merced-Torres on June 9, 2009 under the laws of the Commonwealth of Puerto Rico.

## IV. THE FACTS

9. Plaintiffs are all respected businessmen who work mainly on the construction and refrigeration services industry.

COMPLAINT

Eliu Tossas-Castro, et al. v. Miguel A. Merced-Torres, et al.

4

10. On the last week of May, 2010 Plaintiff Eliu Tossas met with a client, Mr. Javier López, in Humacao.

11. They were discussing a project based on remodeling the offices of the Drivers Service Center (CESCO) of Humacao, a division of the Department of Transportation of Puerto Rico.

12. Plaintiff Eliu Tossas asked Mr. Lopez about the possibility of being an investor on a construction project because this Plaintiff had all of human personnel required to do the job but could use the financing available to Mr. Lopez.

13. Mr. Lopez told Plaintiff to find a project and that he would evaluate the possibility of investing in it, but that it couldn't cost more than ten million dollars ($10,000,000).

14. That day Ms. Nayda T. Tefel-Isern called Plaintiff several times with regards to a service that she needed for her home's air conditioning unit.

15. Plaintiff Eliu Tossas knew Mrs. Tefel-Isern because she was one of the managers at the Doral Bank where this Plaintiff had opened his businesses' bank account.

16. When she finally talked to her, Mr. Eliu-Tossas asked her if she knew of someone with a construction project in mind because he had an investor available and he could perform the job.

Case 3:14-cv-01419-GAG-SCC  Document 1  Filed 05/21/14  Page 5 of 21

COMPLAINT                                                                                      5
Eliu Tossas-Castro, et al. v. Miguel A. Merced-Torres, et al.

17. She asked Plaintiff how much money he could get and he responded that he could get ten million dollars ($10,000,000).

18. She replied that she knew someone who had a project related to telecommunication antennas which cost more than a million dollars and that she didn't have all of the details related to said project, but that her partner, Rod Rodriguez, could explain the operation to him in more detail.

19. Mr. Eliu Castro agreed and Mr. Rod Rodríguez proceeded to call him and explained to him all of the details related to the operation.

20. Mr. Rodriguez said that the Federal Telecommunications Commission (Hereinafter "FCC") wanted to end the monopoly that existed with regards to the telecommunication antennas installed on the island, so that corporations and the people who owned these antennas could only have fifty (50) or less of them and if they had more than that they had to give them to the Federal Government.

21. According to Rod Rodriguez once they gave to those antennas to the Federal Government a new person could own them but that the process could last at least two (2) or three (3) years.

22. During the years that it took for the federal government to take over those antennas, all of the money produced by the

COMPLAINT

Eliu Tossas-Castro, et al. v. Miguel A. Merced-Torres, et al.

operation of each antenna would accumulate in a bank account that would belong to the new owner.

23. He said that he did not have all of the details but that Mr. Miguel A. Merced-Torres had all of the information and contracts.

24. Plaintiff asked Mr. Rod Rodriguez why he wasn't part of the business and why he did not welcome Nayda Tefel to it and he said he did not have the money necessary to invest and that Nayda had gone through a bankruptcy process and thus was not eligible by the regulations of the FCC.

25. Mr. Rod Rodríguez said he could introduce Plaintiff to Mr. Merced-Torres but that he had to pay him 40% of the retained earnings and 40% of all the annual earnings since the moment that Plaintiff officially received the communications antenna.

26. Another condition was that Plaintiff had to present them evidence of his economic capability to invest in the project through a letter from a bank.

27. Plaintiff never reached an agreement with Mr. Rodriguez about giving him 40% of the earnings, but he did gave him a letter from Santander Securities indicating that the money required for the acquisition of the antennas was available at that financial institution.

**COMPLAINT**
Eliu Tossas-Castro, et al. v. Miguel A. Merced-Torres, et al.

28. This letter was shown after Mr. Rodriguez had insisted that the same was needed in order for Mr. Merced-Torres to agree to meet with him.

29. Once the meeting was scheduled Plaintiff hired the services of Quiñones and Arbona Law Offices so they could come to the meeting with him and give him their legal advice.

30. Once there, they waited for more than an hour at Mr. Merced-Torres' offices in Caguas but then the attorneys left, since the Defendant would not come out to meet them.

31. Plaintiff decided to wait until Mr. Merced-Torres came out so he could speak to him personally.

32. When Mr. Merced-Torres finally came out he told Mr. Eliu Tossas that he did not trust lawyers and that he preferred to meet with his clients without that type of intermediaries.

33. Mr. Merced-Torres identified himself as an authorized FCC agent and that his corporation, MM Technology Wireless Group, Corp. was certified to collect money and grant communication antennas licenses on behalf of said federal agency and then proceeded to explain the whole project to Mr. Eliu Tossas in detail while he showed him documents that Plaintiffs later learned were forged.

34. After the meeting was over Mr. Merced invited Mr. Eliu Tossas to eat at the Chili's restaurant located at the Las

Catalinas Mall. He decided to go over in Plaintiff's car, while Mr. Rod Rodríguez and a man named David Martin went in another car.

35. On their way to Chili's he asked Plaintiff about the deal that Mr. Rod Rodríguez and Mrs. Tefel-Insern were offering him.

36. Plaintiff told him that they were asking for 40% percent of the earnings.

37. Defendant Merced-Torres said that this deal was unfair so he was going to work directly with Plaintiff and that he would help him.

38. Weeks later, Mr. Merced-Torres called Plaintiff and told him that he was going to help him with everything so that he could obtain a license to operate and own some of the towers and asked him how much money he had.

39. Eliu Tossas said that he had $80,000 available.

40. Said amount of money was lent to Mr. Eliu Tossas by Plaintiff Colón-Cordova.

41. Those $80,000 were given by Mr. Eliu Tossas to co-defendant Merced-Torres on August, 2010.

42. Subsequently, on September 13, 2010, Eliu Tossas gave Mr. Merced-Torres a check for the amount of $100,000.

43. Those $100,000 came from a loan made to Mr. Eliu Tossas by his brother, Plaintiff Esteban Tossas.

Case 3:14-cv-01419-GAG-SCC   Document 1   Filed 05/21/14   Page 9 of 21

COMPLAINT                                                                        9
Eliu Tossas-Castro, et al. v. Miguel A. Merced-Torres, et al.

44. In the following months Mr. Eliu Tossas gave the Defendant an additional $90,000 in a check from his commercial bank account and $26,000 dollars in cash.

45. On January of 2011, Defendant Merced-Torres communicated with Plaintiff Eliu Tossas thru telephone conversations and text messages informing him that he had other communication towers available from the FCC and that if he knew of anyone that he wanted to help and who would be interested in the project.

46. Mr. Eliu Tossas told him that he wanted to tell Plaintiffs Esteban Tossas and Cordova-Colón, since they had helped him with his initial invesment.

47. A week later, Defendant Merced-Torres called Mr. Eliu Tossas and told him that there was an antenna available for his brother Esteban.

48. Pursuant to this, Mr. Estaban Tossas proceeded to pay $70,000 to Merced-Torres; money that he obtained after receiving a private loan with a property belonging to Eliu Tossas used as a collateral.

49. At this time Mr. Merced-Torres insisted that he needed said payment in cash in order to expedite the proceedings with the FCC, so the Tossas-Castro Plaintiffs' cashed-in the check for $70,000 at the Catalinas Branch of the Banco Popular and

proceeed to hand him said amount in cash in front of the building.

50. Before leaving, Mr. Merced-Torres told them that the last information that he had received from the FCC was that the drafting of the contracts related to Plaintiffs' antennas was in its final stages and that it would be signed within three(3) to six(6) months.

51. On the first week of May, 2011, Mr. Merced-Torres offered another set of towers to Plaintiff Esteban Tossas.

52. This time he asked for $40,000, so on that Friday Mr. Esteban Tossas made a check for said amount payable to "Miguel Merced", but he refused to take it, saying that the check had to be made to the name of "MM Technology Wireless Group, Corp.".

53. At that time Mr. Esteban Tossas did not have any more checks with him, so he told Merced-Torres that he would have to bring him the money on another day.

54. The defendant immediately told him that he had "friends" at the Banco Popular's, Las Catalinas branch and that he would call them and ask them for some provisional checks for him.

55. When Esteban got to the bank a friendly employee talked to him a prepared the checks without him having to wait in line.

56. Estaban Tossas prepared the check for the amount of $40,000 in the name of MM Technology Wireless Group, Corp. in the

Case 3:14-cv-01419-GAG-SCC   Document 1   Filed 05/21/14   Page 11 of 21

COMPLAINT                                                                                       11
Eliu Tossas-Castro, et al. v. Miguel A. Merced-Torres, et al.

parking lot of the bank and proceeded to hand it to Mr. Merced-Torres.

57. By the end of the year 2011, the Tossas-Castro Plaintiffs started exchanging several text messages and e-mails with the Defendant, since more than six(6) months had passed since the date given to them in which the FCC would had approved the project and the contracts would be signed.

58. Mr. Merced-Torres would continously give excuses regarding the reasons why the contracts weren't signed, from the people in charge at the FCC being substituted by other officials to that the attorneys in charge had left the firm and the new ones were familiarizing with the business file.

59. Each time he would tell them by phone and/or text messages that he would soon be contacting them to travel with him to the FCC headquarters in Washington so they can sign their contracts with the agency and have the ownership of the towers that they paid for be transferred to them.

60. On April 17, 2012, Defendant Merced-Torres called Eliu Tossas' cell phone and told him that he had some antennas available for Plaintiff Nelson Colón-Cordova and that its cost was $27,500.

61. Mr. Tossas immediately called Mr. Colon-Cordova who asked to meet with the Defendant in person before making a decision.

**COMPLAINT**
Eliu Tossas-Castro, et al. v. Miguel A. Merced-Torres, et al.

62. So the next day, the Defendant met with Plaintiff Colon-Cordova at Eliu Tossas' house.

63. There Mr. Merced-Torres repeated his story that he and his corporation were authorized by the FCC to collect money and grant licences to investors with relation to communication towers located on the Island.

64. He went on to say that the only reason that those antennas were available is because one of the investors had problems with the law and the FCC had ordered that they been taken away from him and given to a new investor.

65. After convincing Plaintiff Colon-Cordova that his proposal was legitimate and that he was in fact authorized by the FCC, the Defendant said that in order to get on the business this Plaintiff had to pay him $27,500 on the next day, which curiously was the same exact amount that this Plaintiff had available on his bank account at Banco Santander.

66. Mr. Colon-Cordova proceeded to call the Defendant the next day and they met at a construction project that this Plaintiff had in Caguas.

67. There as instructed, he gave Mr. Merced-Torres two(2) manager's checks; one for $17,000 payable to "MM Technology Wireless Group, Corp." and another for $10,000 payable to ""Oriental Bank".

Case 3:14-cv-01419-GAG-SCC   Document 1   Filed 05/21/14   Page 13 of 21

COMPLAINT
13
Eliu Tossas-Castro, et al. v. Miguel A. Merced-Torres, et al.

68. He told Mr. Colon-Cordova that he would deposit those checks on a special bank account created for purposes of the agreement with the FCC and that once the contract with the agency was signed the money would be available.

69. After that day, the Defendant spoke thru the phone and wrote several text messages and e-mails to the Plaintiffs stating that the only step left was the signing of the contracts with the FCC, something that would be happening within the next few weeks.

70. After weeks and months passed without receiving a firm answer from Merced-Torres as to when the contract with the FCC would be signed, the Plaintiffs started becoming anxious.

71. Finally on March of 2013, he called and gave Eliu Tossas a date that they supposed to fly with him to Washington DC so they could sign the contracts with the FCC.

72. He told them to be ready, but not to buy any plane tickets, since he would be taking care of those arrangements.

73. Notwithstanding this, he called Eliu Tossas a couple of days later telling him that the previously informed date had been postponed *sine die* due to some procedural problems at the FCC, but that he would be calling him soon to inform him of the new date.

Eliu Tossas-Castro, et al. v. Miguel A. Merced-Torres, et al.

74. The last time that Plaintiff Esteban Tossas had any contact with the Defendant was on April 16, 2013 at 2:39 PM when Merced-Torres wrote to him the following: "Good afternoon, I'm just waiting for things to go back to normal. It was supposed to happen two weeks ago but give me three (3) more days and on Friday and I'll let you know what day the contract signing is going to take place."

75. Afte that day the Defendant stopped returning Estaban Tossas' text messages and phone calls.

76. A couple of days later, Eliu Tossas was contacted by FBI agent Lorna Vazquez who wanted to meet with him with regards to his business investments.

77. A couple of weeks later, another Federal Agent went to Eliu Tossas' house and left his card with Plaintiff's wife.

78. He proceeed to call this agent, who asked him if he had lost any amount of money on any business invesment.

79. At that time the Plaintiffs were still waiting to be informed by the Defendant the date in which they would travel to Washington DC to sign their contracts with the FCC, so it hadn't crossed his mind that there was anything fraudulent with the communication tower's allegedly sold to him by the Defendant.

COMPLAINT

Eliu Tossas-Castro, et al. v. Miguel A. Merced-Torres, et al.

80.   Thus, Eliu said that he hadn't lost any money on any of his invesment and agreed to contact this agent on a later time to schedule a meeting.

81.   After the phone call was over, Plaintiff texted Mr. Merced-Torres and asked him if he knew anything about what the federal agent told him.

82.   The Defendant's answer was that the Federal Government was investigating one of the communication towers investor's private dealings and that he shoudn't worry about it and that the Plaintiff wasn't obligated to meet with any Federal Agent unless he received a subpoena.

83.   That was the last time that Plaintiff Eliu Tossas had any contact with Miguel Merced-Torres, since the latter stopped returning his phone calls, e-mails and texts messages and closed his office in downtown Caguas.

84.   As a result of this, Plaintiffs Eliu Tossas and Colon-Cordova scheduled a meeting with the Federal Agent who had contacted him previously.

85.   That meeting took place on the month of July of 2013 at the Secret Service offices in Guaynabo.

86.   During that meeting the Plaintiffs explained to the Secret Service Agent how they had met the Defendant, what had been

Case 3:14-cv-01419-GAG-SCC   Document 1   Filed 05/21/14   Page 16 of 21

COMPLAINT

16

Eliu Tossas-Castro, et al. v. Miguel A. Merced-Torres, et al.

offered to them and the amount that they had paid to him to be part of the alleged business with the FCC.

87. During that meeting, Plaintiffs became aware for the first time on an unequivocal manner that the Defendant was not an authorized FCC agent and that what he had offered them couldn't possibly happen.

88. On April 28, 2014 a Federal Grand Jury issued an indictment against Defendant Miguel A. Merced-Torres for using intestate wired communications to commit fraud and money laundering against the Plaintiffs in this case and other individuals with regards to the scam manstermined by him as to the representations that he was a sanctioned FCC agent with the authority to collect funds and negotiate licences with regards to telecommunication antennas on the Island on behalf of that federal agency.

89. Said criminal case is filed under criminal no. 14-0293(JAG).

90. All the economic losses, injuries, damages, mental anguish and suffering endured by the Plaintiffs as narrated herein were caused by the Defendants' intentional and fraudulent actions.

## V. FIRST CAUSE OF ACTION

### (Rico violations pursuant to 18 U.S.C. § 1962(c) by the Defendants)

16

91.   The allegations contained in paragraph No. 1 through No. 90 of this Complaint are incorporated by reference as if fully set forth herein by Plaintiffs.

92.   The facts set forth in this Complaint constitute a criminal enterprise by the Defendant Miguel A. Merced-Torres and his corporation MM Technology Wireless Group, Corp., as stated on 18 U.S.C. § 1961(4), where they engaged and affected interstate and foreign commerce.

93.   By the same token, Defendant Miguel A. Merced-Torres and his corporation MM Technology Wireless Group, Corp. are persons within the meaning of 18 U.S.C. § 1961(3), as they were both capable of having a legal interest in property.

94.   The racketeering activities performed by these defendants include wire fraud in violation of 18 U.S.C. § 1343 by using cell phones, text messages and e-mails in interstate commerce to perform and further their illegal scam.

95.   Similarly, these Defendants incurred in money laundering in violation of 18 U.S.C. § 1957, by receiving and negotiating bank checks in interstate commerce in order to further their racket and defraud the Plaintiffs in this case. These monetary transactions each exceeded $10,000.

Case 3:14-cv-01419-GAG-SCC   Document 1   Filed 05/21/14   Page 18 of 21

18

COMPLAINT
Eliu Tossas-Castro, et al. v. Miguel A. Merced-Torres, et al.

96.  The illegal actions narrated in this Complaint constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5), which started no later than May of 2010 and which lasted until the Defendants indictment issued on April 28, 2014.

97.  As a result of this criminal activities the Plaintiffs suffered economic losses and damages in the following amounts:

a) Plaintiff Eliu Tossas-Castro-$296,000.00

b) Plaintiff Esteban Tossas-Castro-$110,000

c) Plaintiff Norman Colón-Cordova-$27,500

d) Pursuant to the RICO act said amounts shall be tripled, in addition to the payment of interest and attorneys' fees.

## VI. SECOND CAUSE OF ACTION

### (Damages under Article 1802 of the Puerto Rico Civil Code)

98.  The allegations contained in paragraph No. 1 through No. 97 of this Complaint are incorporated by reference as if fully set forth herein by Plaintiff.

99.  The willful acts of the defendants renders them jointly and severally liable under Articles 1802 and 1803 of the Puerto Rico Civil Code for compensatory damages in favor of Plaintiff for an amount of no less than $1,000,00.00 dollars for each of them for

their economic losses and the emotional damages suffered by them as a result of the Defendants racketeering activities.

## VII. THIRD CAUSE OF ACTION
## (Article 1077 off the Puerto Rico Civil Code)

100. The allegations contained in paragraph No. 1 through No. 99 of this Complaint are incorporated by reference as if fully set forth herein by Plaintiff.

101. The facts set forth in this Complaint also constitute a breach of contract under Article 1044 of the Puerto Rico Civil Code.

102. Thus, Plaintiffs are entitled to an award of no less than $200,000 each for the economic losses and damages suffered as a result of said breach.

## VIII. ATTORNEY FEES, COST AND PREJUDGMENT INTERESTS

103. The allegations contained in paragraph No. 1 through No. 102 of this Complaint are incorporated by reference as if fully set forth herein by Plaintiffs.

104. The Defendants are hereby jointly liable to Plaintiffs for all sums hereby requested as well as for all pre-judgment and post-judgment interest, costs and attorney fees pursuant to the applicable Federal and Commonwealth laws invoked in this Complaint.

**COMPLAINT**
Eliu Tossas-Castro, et al. v. Miguel A. Merced-Torres, et al.

## IX.  JURY TRIAL

105. Plaintiffs hereby invoke their right to a jury trial pursuant to the Seventh Amendment of the United States Constitution for all issues so triable.

## X. PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully pray for this Honorable Court to enter Judgment imposing on Defendants the payment of a) a compensation of no less than $296,000.00 under the RICO act for Plaintiff Eliu Tossas-Castro, a compensation of $110,000 for Plaintiff Esteban Tossas-Castro under the RICO Act, a compensation of $27,000 for Plaintiff Norman Colón-Cordova under the RICO Act and that those amount be tripled; b) a compensation of no less than $1,000,000.00 under Article 1802 of the Puerto Rico Civil Code for each of the Plaintiffs; c) a compensation of no less than $200,000 for each of the Plaintiffs under Article 1077 of the Puerto Rico Civil Code d) all with interests, attorney fees and the costs of the litigation, as well as any other remedy that this Honorable Court deems proper.

**RESPECTFULLY SUBMITTED** in Caguas, Puerto Rico on this 21st day of May of 2014.

**FRANCIS & GUEITS' LAW OFFICES**
PO Box 267
Caguas, PR 00726

**COMPLAINT**
Eliu Tossas-Castro, et al. v. Miguel A. Merced-Torres, et al.

Tel.(787)745-3100
Fax. (787) 745-3100
E-Mail: jgueits@fglawpr.com
cfrancis@fglawpr.com


**S/JOSÉ J. GUEITS-ORTIZ**
**JOSÉ J. GUEITS-ORTIZ**
U.S.D.C.-P.R. Bar No. 224704


**S/CHRISTIAN J. FRANCIS-MARTÍNEZ**
**CHRISTIAN J. FRANCIS-MARTÍNEZ**
U.S.D.C.-P.R. Bar No. 227105